[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 12-16488

_____

D.C. Docket No. 1:09-cv-00955-TWT


FEDERAL TRADE COMMISSION,

Plaintiff - Counter Defendant - Appellee,

versus

ABBVIE PRODUCTS LLC,

Defendant - Appellant.


_____

Appeal from the United States District Court
for the Northern District of Georgia

_____

(March 21, 2013)

Before MARCUS, BLACK and SILER,[*] Circuit Judges.

MARCUS, Circuit Judge:

Several years ago, Appellee Federal Trade Commission ("FTC") began

investigating a settlement between Appellant AbbVie Products LLC, then known

---

[*] Honorable Eugene E. Siler, Jr., United States Circuit Judge for the Sixth Circuit, sitting by designation.

as Solvay Pharmaceuticals ("Solvay"), and several other pharmaceutical companies. The settlement, the FTC believed, violated the antitrust laws because the companies effectively had colluded to preserve the monopoly profits from Solvay's highly lucrative patent on AndroGel, a topical testosterone gel. During the course of the investigation, Solvay voluntarily disclosed a confidential document called the Project Tulip Financial Analysis ("Tulip FA"), which projected AndroGel's profits and also discussed the appropriate terms of, and benefits from, a settlement between Solvay and its competitors. The FTC filed an antitrust suit against Solvay and the other pharmaceutical companies based on the settlement and attached the Tulip FA as the sole exhibit to its complaint.

In 2010, Solvay convinced a district court judge in the Northern District of Georgia to issue a protective order sealing the Tulip FA because the document contained sensitive financial information that could be harmful to Solvay's business interests. The district court eventually dismissed the FTC's suit, and a panel of this Court affirmed. FTC v. Watson Pharm., Inc., 677 F.3d 1298 (11th Cir. 2012). In 2012, however, the Supreme Court issued a writ of certiorari to review this Court's decision in Watson, and the FTC returned to the district court and asked for the Tulip FA to be unsealed so that the FTC and its amici could discuss the document openly in the Supreme Court. The district court did so, based in large part on its finding that the harms Solvay would suffer from the Tulip FA's being

made public have been reduced in the intervening three years. Solvay appeals the district court's decision to modify the earlier protective order and unseal the Tulip FA. Because we conclude that the district court did not abuse its considerable discretion to modify its own protective order, we affirm.

I.

A.

Solvay Pharmaceuticals, which was later acquired by Abbott Laboratories and subsequently renamed AbbVie Products LLC, had a license to sell a topical testosterone gel called AndroGel. Watson, 677 F.3d at 1304. AndroGel was protected by a patent that expired in 2020, and therefore Solvay had a monopoly on its sale, which resulted in more than $1.8 billion in revenue. However, a threat to this very lucrative business emerged; two other drug manufacturers, Watson Pharmaceuticals and Paddock Laboratories, developed generic versions of AndroGel and sought FDA approval to begin selling those products. Id.

To defend its patent, Solvay filed a patent infringement lawsuit against Watson and Paddock. Par Pharmaceuticals became involved in the lawsuit by sharing the costs of litigation with Paddock in exchange for a share of the potential profits. Id. Faced with the possibility that its patent would be invalidated, and the generic entrants allowed into the market, Solvay opted to settle with Watson and Par/Paddock. The settlement agreement featured a so-called "reverse payment," in

3

which Solvay paid Watson and Par/Paddock to delay marketing their generic versions of AndroGel until 2015. Id. at 1305. The upshot of the settlement was that Solvay got to keep its monopoly until 2015, with the reverse payments to its potential competitors effectively giving them a share of the monopoly profits.

The FTC has contested the legality of reverse payments for some time, claiming that "they closely resemble the sorts of horizontal agreements to suppress competition that have previously been condemned under the antitrust laws" and "[n]othing in the Patent Act legitimizes the use of reverse payments." Brief for Pet'r at 15-16, FTC v. Actavis, 133 S. Ct. 787 (No. 12-416). Upon learning of Solvay's settlement, the FTC began investigating the matter and ultimately filed an antitrust lawsuit against Solvay, Watson, Par, and Paddock, which was transferred to the Northern District of Georgia. Watson, 677 F.3d at 1305. During its investigation, the FTC asked Solvay to divulge confidential documents regarding the settlement of the patent litigation and the development, marketing, and sale of AndroGel. The FTC's written request stated that "[i]nformation submitted in response to this letter will be afforded confidential treatment and is exempt from disclosure under the Freedom of Information Act, as provided in 16 C.F.R. §§ 4.10-4.11 and 15 U.S.C. §§ 46(f) and 57b-2(f), respectively." Solvay cooperated with the investigation.

4

In particular, Solvay produced the Tulip FA, an April 2006 document that contained revenue and profit projections for the AndroGel product line along with recommendations for how to settle the patent infringement suit between Solvay and its competitors. The Tulip FA was created by a Solvay financial analyst, Elaine Yang, to assist Solvay's management during settlement negotiations with Watson and Paddock.

### B.

In the underlying antitrust action, the FTC sought to attach the Tulip FA to its second amended complaint and filed the document under temporary seal to give Solvay an opportunity to seek a protective order from the district court sealing the document.[1] Solvay promptly moved for a protective order sealing the Tulip FA, which the district court granted in February 2010. Specifically, the district court found that Solvay "ha[d] shown good cause for sealing indefinitely [the Tulip FA] which contains sensitive and confidential information."

During this time, Solvay sought to dismiss the complaint because, as a matter of law, Eleventh Circuit precedent established that anticompetitive behavior within the "scope of the patent" was not a violation of the antitrust laws. Prior to sealing the exhibit, the district court dismissed the complaint on this basis, In re

---

[1] Pursuant to 15 U.S.C. § 57b-2 and 16 C.F.R. § 4.10, the FTC may disclose documents received during an investigation in judicial proceedings, provided that the FTC gives the submitter notice and an opportunity to seek a protective order from the court.

5

AndroGel Antitrust Litig., 687 F. Supp. 2d 1371, 1378-79 (N.D. Ga. 2010), and a panel of this Court affirmed, Watson, 677 F.3d 1298. The panel in Watson based its decision largely on prior precedent, which "establish[ed] the rule that, absent sham litigation or fraud in obtaining the patent, a reverse payment settlement is immune from antitrust attack so long as its anticompetitive effects fall within the scope of the exclusionary potential of the patent." Id. at 1312. The FTC sought Supreme Court review, and the Supreme Court granted certiorari in the case on December 7, 2012. FTC v. Actavis, Inc., 133 S. Ct. 787 (2012). The question presented in that case is whether reverse-payment agreements, such as the one between Solvay and its competitors, are per se lawful unless the underlying patent litigation was a sham or the patent was obtained by fraud, or instead are presumptively anticompetitive and unlawful. See Pet'n for Writ of Certiorari at I, Actavis, 133 S. Ct. 787 (No. 12-416). The parties submitted the Tulip FA to the Supreme Court in a sealed volume of the parties' Joint Appendix.

Shortly after the grant of certiorari, the FTC moved the district court to unseal the Tulip FA, claiming that both the FTC and its amici wished to discuss the document's contents in the Supreme Court, and that the public interest supported unsealing the document. The FTC submitted evidence that, since Solvay's acquisition by Abbott, the company had disclosed information regarding the volume of AndroGel sales and had also introduced a new version of the product,

6

AndroGel 1.62%, which was different than the AndroGel 1% product discussed in the Tulip FA.

Solvay opposed the motion and argued that the Tulip FA would allow both competitors and counterparties to reverse-engineer Solvay's profit margins, which would give them an advantage in product pricing and rebate negotiations. Solvay also disputed the FTC's need for the document to be public and argued that it had produced the document in reliance on the FTC's promises of confidential treatment. As for the proper test to apply, Solvay argued that "[t]he party seeking modification of a protective order bears the burden of demonstrating good cause for the modification, particularly where, as here, good cause was shown for entry of the original protective order."

The FTC responded by introducing additional evidence, including testimony from the Tulip FA's author, Yang. Yang testified that she could not reverse-engineer Solvay's profit margins using the Tulip FA alone. In addition, the FTC presented testimony from Solvay's then-CEO, Laurence J. Downey, who said that the costs of producing AndroGel had changed in the months following the Tulip FA's creation. Finally, the FTC argued that Solvay had no valid reliance claim because Solvay could not have reasonably expected that the document would not be disclosed in a judicial proceeding.

7

After oral argument, the district court immediately granted the motion to modify its protective order and unseal the Tulip FA but granted Solvay's motion to stay the unsealing until Solvay had a chance to appeal. The court later issued a brief written order embodying its decision. In relevant part, the court found:

> a. There is a presumption that documents relevant to legal decisions are public.
>
> b. The Supreme Court granted certiorari in this case on December 7, 2012. It is in the public interest for the parties to be able to discuss in their briefing and in oral arguments to the Supreme Court the details of the economic and financial projections in Exhibit A. The FTC may, for example, highlight the document as an illustration of its view that agreements like those at issue in this case are anticompetitive and in violation of the antitrust laws. The defendants, on the other hand, may want to show, should they choose to make the argument, the power that patent exclusivity gives them. This interest extends not just to the parties, but also to any amici, who should have access to the document and be able to discuss it openly in their briefing.
>
> c. The sensitivity of the information and the potential for competitive injury to Solvay if the information is disclosed has been reduced, although not eliminated, with the passage of time. The Court takes very seriously Solvay's concerns, particularly about the effect of disclosure on competitors' pricing and on rebate negotiations, but the passage of time has reduced the likelihood of serious injury to Solvay in either of those areas.
>
> d. The weight to be given to the public's interest in knowing why decision-makers have made the decisions that they have made, or will make, has changed since the Court's earlier orders sealing the document.
>
> e. The public interest in making this record public outweighs the private interests of Solvay in its confidential information.

The district court granted Solvay a stay until January 2, 2013, to appeal.

8

On December 26, 2012, Solvay filed an emergency motion for expedited briefing and consideration or an extension of stay pending appeal. A panel of this Court granted a temporary stay to rule on the motion and, on January 10, 2013, granted Solvay a stay pending this appeal and expedited the case.

## II.

District courts are in a superior position to decide whether to enter or modify protective orders, and it is well established that "the decision as to access is one best left to the sound discretion of the trial court . . . ." Nixon v. Warner Commc'ns, 435 U.S. 589, 599 (1978); accord Pub. Citizen v. Liggett Grp., Inc., 858 F.2d 775, 790 (1st Cir. 1988) ("Control of pretrial discovery, including the entry or modification of a protective order, is a matter falling peculiarly within the discretion of the district court."); In re Agent Orange Prod. Liab. Litig., 821 F.2d 139, 147 (2d Cir. 1987) ("Whether to lift or modify a protective order is a decision committed to the sound discretion of the trial court.").

Thus, we review a district court's order lifting or modifying a protective order and unsealing a document only for abuse of discretion. McCarthy v. Barnett Bank, 876 F.2d 89, 91 (11th Cir. 1989). "A district court abuses its discretion if it applies an incorrect legal standard, applies the law in an unreasonable or incorrect manner, follows improper procedures in making a determination, or makes findings of fact that are clearly erroneous," Thomas v. Blue Cross & Blue Shield

9

Ass'n, 594 F.3d 814, 821 (11th Cir. 2010) (internal quotation marks omitted), and also "when it misconstrues its proper role, ignores or misunderstands the relevant evidence, and bases its decision upon considerations having little factual support.'" Jove Eng'g, Inc. v. IRS, 92 F.3d 1539, 1546 (11th Cir. 1996) (quoting Arlook v. S. Lichtenberg & Co., 952 F.2d 367, 374 (11th Cir. 1992)).

Solvay identifies several errors in the district court's decision that, according to Solvay, each qualifies as an abuse of discretion. First, Solvay claims that the district court erred as a matter of law by treating the Tulip FA as a judicial record to which the strong presumption of public access applies, because neither the district court nor this Court relied at all on the Tulip FA in dismissing or affirming the dismissal of the underlying antitrust case. Second, Solvay says that the district court erred as a matter of law by failing to apply the right standard to the motion. According to Solvay, the court should have modified its order only if the FTC demonstrated "extraordinary circumstances," not merely good cause. The combination of the first two errors led the district court to presume the document should have been unsealed rather than placing a heavy burden on the FTC to show why the document should be unsealed. Third, Solvay argues that the district court abused its discretion by failing to consider Solvay's reliance on the protective order. Finally, Solvay insists that, under either the extraordinary-circumstances or good-cause balancing test, the court abused its discretion by failing to find that the

10

balance of equities favors maintaining the protective order. None of these arguments withstands close scrutiny.

## A.

Solvay first disputes whether the Tulip FA, which was the sole exhibit attached to the FTC's complaint, constitutes a judicial record subject to the common-law right of access. The common-law right of access "establish[es] a general presumption that criminal and civil actions should be conducted publicly" and "includes the right to inspect and copy public records and documents." Chi. Tribune Co. v. Bridgestone/Firestone, Inc., 263 F.3d 1304, 1311 (11th Cir. 2001) (per curiam). It is "an essential component of our system of justice" and "is instrumental in securing the integrity of the process." Id. However, "[t]he right to inspect and copy is not absolute, . . . and a judge's exercise of discretion in deciding whether to release judicial records should be informed by a sensitive appreciation of the circumstances that led to the production of the particular document in question. . . . [T]he common-law right of access requires a balancing of competing interests." Id. (internal quotation marks, alterations, and citation omitted).

"[W]hen applying the common-law right of access federal courts traditionally distinguish between those items which may properly be considered public or judicial records and those that may not; the . . . public presumptively

ha[s] access to the former, but not to the latter." Id. The test for whether a judicial record can be withheld from the public is a balancing test that weighs "the competing interests of the parties" to determine whether there is good cause to deny the public the right to access the document. Id. at 1312. Our case law lists several relevant factors to consider, including "whether the records are sought for such illegitimate purposes as to promote public scandal or gain unfair commercial advantage, [and] whether access is likely to promote public understanding of historically significant events." Newman v. Graddick, 696 F.2d 796, 803 (11th Cir. 1983).

Solvay does not contest that the FTC's complaint itself is a judicial record, nor could it. A complaint, which initiates judicial proceedings, is the cornerstone of every case, the very architecture of the lawsuit, and access to the complaint is almost always necessary if the public is to understand a court's decision. Indeed, the complaint is so fundamental to litigation that the plaintiff's pleadings in the complaint determine whether a federal court has jurisdiction to even entertain the claim. See Louisville & Nashville R.R. Co. v. Mottley, 211 U.S. 149, 152-54 (1908). Moreover, a large number of lawsuits -- including the underlying controversy between the FTC and Solvay that is currently before the Supreme Court -- are disposed of at the motion-to-dismiss stage, where a court determines solely on the basis of the complaint whether the plaintiff has made sufficient

factual allegations to state a claim under Fed. R. Civ. P. 12(b)(6). See Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555-56 (2007). For this reason, courts have consistently treated complaints as judicial records for purposes of determining whether the common-law right of access applies. See IDT Corp. v. eBay, --- F.3d ----, 2013 WL 490751, at *2 (8th Cir. Feb. 11, 2013) (parties conceded "that the antitrust complaint in this case is a 'judicial record'" consistent with the "modern trend in federal cases to treat pleadings in civil litigation (other than discovery motions and accompanying exhibits) as presumptively public"); Mann v. Boatright, 477 F.3d 1140, 1149 (10th Cir. 2007) (treating complaint as judicial record); United States v. Martin, 746 F.2d 964, 968 (3d Cir. 1984) (the common-law right of access encompasses "transcripts, evidence, pleadings, and other materials submitted by litigants" (internal quotation marks omitted)).

Our case law is consistent with this treatment of the complaint as a judicial record. In Chicago Tribune, we crafted the general rule "that material filed with discovery motions is not subject to the common-law right of access, whereas discovery material filed in connection with pretrial motions that require judicial resolution of the merits is subject to the common-law right." 263 F.3d at 1312. The rationale for the distinction was that this "more refined approach" was necessary to account for "the unique function discovery serves in modern proceedings." Id. As another court of appeals has explained, "it must be recognized that an abundance

13

of statements and documents generated in federal litigation actually have little or no bearing on the exercise of Article III judicial power." United States v. Amodeo, 71 F.3d 1044, 1048 (2d Cir. 1995). The overwhelming majority of documents disclosed during discovery are likely irrelevant to the underlying issues and will not be "heard or read by counsel" or "by the court or other judicial officer." Id. Thus, we had ample reason in Chicago Tribune to exempt materials attached to discovery motions from the presumption of public access while retaining that presumption for materials that invoke "judicial resolution of the merits," such as complaints, motions to dismiss, or motions for summary judgment. See 263 F.3d at 1312 & n.11.

If a complaint is a judicial record, then it follows that attached exhibits must also be treated as judicial records. Indeed, under the Federal Rules of Civil Procedure, "[a] copy of a written instrument that is an exhibit to a pleading is a part of the pleading for all purposes." Fed. R. Civ. P. 10(c). At the motion-to-dismiss stage, we consider the facts derived from a complaint's exhibits as part of the plaintiff's basic factual averments. See Solis-Ramirez v. U.S. Dep't of Justice, 758 F.2d 1426, 1430 (11th Cir. 1985) (per curiam). We even treat specific facts demonstrated by exhibits as overriding more generalized or conclusory statements in the complaint itself. See Griffin Indus., Inc. v. Irvin, 496 F.3d 1189, 1206 (11th Cir. 2007) ("[W]hen the exhibits contradict the general and conclusory allegations

14

of the pleading, the exhibits govern." (citing Assoc. Builders, Inc. v. Ala. Power Co., 505 F.2d 97, 100 (5th Cir. 1974))). Thus, to the same extent that the FTC's complaint is a judicial record, so too is the attached Tulip FA.

Solvay's argument to the contrary is unavailing and misreads Chicago Tribune and Amodeo. According to Solvay, the fact that the district court and the panel of this Court in Watson did not rely on the Tulip FA or cite it in their decisions indicates that the public does not need to have access to the document to understand those decisions. Solvay places great weight on the fact that Chicago Tribune cites Amodeo in a footnote, see Chi. Tribune, 263 F.3d at 1312 n.11, and that Amodeo characterizes documents as falling along a "continuum" where "the weight to be given the presumption of access [is] governed by the role of the material at issue in the exercise of Article III judicial power and the resultant value of such information to those monitoring the federal courts." 71 F.3d at 1049. But Chicago Tribune did not, by citing Amodeo, adopt an ad hoc standard that a document's status as a judicial record is dependent upon whether it played a discernible role in the resolution of the case. The holding in Chicago Tribune established a bright-line rule exempting discovery materials from the common-law right of access. 263 F.3d at 1312. This is a simple rule to apply and does not involve locating the exhibit on a continuum by determining the actual role the document played -- by, for instance, counting the number of times the district court

15

cited it while deciding a motion to dismiss. Instead, we determine whether a document is a judicial record depending on the type of filing it accompanied. A complaint and its exhibits, which are integral to the "judicial resolution of the merits" of any action, are surely "subject to the common-law right." Id.

In this case, the Tulip FA was not part of a discovery motion but rather was the sole exhibit appended to the FTC's complaint, and therefore was a judicial record. The FTC's complaint repeatedly referred to the exhibit in general terms, although the complaint could not (and did not) discuss the Tulip FA's contents in detail due to the then-existing protective order. Thus, the district court was right to weigh the public's interest in viewing the document against Solvay's interest in it remaining confidential under the good-cause balancing test articulated in Chicago Tribune.

Solvay raises one final point on this issue. Even granting that exhibits attached to a complaint are ordinarily judicial records, Solvay asks us to draw a narrow exception for "confidential, previously sealed documents." If the public could access confidential documents, Solvay claims, then plaintiffs could "exploit the public access doctrine by obtaining highly confidential commercial documents through pre-complaint investigations or discovery undertaken with assurances of confidentiality, attaching them as exhibits to pleadings, and then seeking to publicly reveal those documents" for the purpose of pressuring defendants to settle.

But Solvay does not provide any precedent for this proposed exception, and, notably, the policy reasons Solvay advocates are purely speculative and not at all present in the circumstances of this case. The Tulip FA was the sole exhibit to the FTC's amended complaint and had a direct bearing on the economic advantages that Solvay reaped by entering into a reverse-payment settlement. There is not the slightest indication in this record that the document's inclusion was a tactic by the FTC, or that the document was included solely to coerce Solvay rather than to influence the judicial resolution of this case. Moreover, insofar as this potential for abuse does exist in other cases, there are already sufficient remedies to address it. Indeed, the Second Circuit raised this possibility in Amodeo and elaborated extensively upon those remedies: "professional sanctions may be available," along with "[m]onetary sanctions . . . under Federal Rule of Civil Procedure 11," or "[a]n action for wrongful civil proceedings." 71 F.3d at 1049. And "a court can strike a pleading as scurrilous under Federal Rule of Civil Procedure 12(f)." Id. Solvay does not explain why these protections would be insufficient in an appropriate case.

Thus, we can discern no abuse of discretion in the district court's characterization of the Tulip FA, attached as an exhibit to the FTC's complaint, as a judicial record.

B.

17

Next, Solvay argues that the district court applied the wrong legal standard anyway and that "the burden should have been on the FTC to show extraordinary circumstances justifying unsealing." According to Solvay, because the motion had already been litigated, and the district court had already found good cause to seal the document, the FTC's motion "was thus actually subject to the standards for a motion for reconsideration." And movants for reconsideration must show "extraordinary circumstances justifying the reopening of a final judgment." Gonzalez v. Crosby, 545 U.S. 524, 535 (2005) (internal quotation marks omitted); see also SEC v. TheStreet.com, 273 F.3d 222, 229 (2d Cir. 2001); Martindell v. Int'l Tel. & Tel. Corp., 594 F.2d 291, 296 (2d Cir. 1979).

But Solvay waived this argument by not raising it in the district court and, indeed, invited the claimed error by affirmatively arguing before the district court for application of the good-cause balancing test rather than the extraordinary-circumstances test it now advocates. "This Court has repeatedly held that an issue not raised in the district court and raised for the first time in an appeal will not be considered by this court." Access Now, Inc. v. Southwest Airlines, Inc., 385 F.3d 1324, 1331 (11th Cir. 2004) (internal quotation marks omitted). "The reason for this prohibition is plain: as a court of appeals, we review claims of judicial error in the trial courts. If we were to regularly address questions . . . that district courts never had a chance to examine, we would not only waste our resources, but also

18

deviate from the essential nature, purpose, and competence of an appellate court." Id. While appellate review is especially inappropriate when the waived claim contains a factual component, see id., courts regularly find that appellants waived purely legal arguments as well -- including arguments regarding what standard should have applied to decide an issue before the district court. See, e.g., G & S Holdings, LLC v. Cont'l Cas. Co., 697 F.3d 534, 538 (7th Cir. 2012) (party waived its argument that a state, and not federal, pleading standard should have applied to a motion to dismiss by failing to make the argument in the district court); Cronquist v. City of Minneapolis, 237 F.3d 920, 924-25 (8th Cir. 2001).

The doctrine of invited error also applies here. "It is a cardinal rule of appellate review that a party may not challenge as error a ruling . . . invited by that party." In re Carbon Dioxide Indus. Antitrust Litig., 229 F.3d 1321, 1327 (11th Cir. 2000) (internal quotation marks omitted); accord Pensacola Motor Sales, Inc. v. E. Shore Toyota, LLC, 684 F.3d 1211, 1231 (11th Cir. 2012) ("A party that invites an error cannot complain when its invitation is accepted."). Or, as another court of appeals has put it, it is "waiver in the truest sense" when a party goes "beyond failing to raise a relevant argument" and in fact "affirmatively relie[s] on" a "standard that they now argue is erroneous." G & S Holdings, 697 F.3d at 538.

Solvay never argued for this heightened standard in the district court and in fact invited the very error for which it now faults the district court. Solvay claims

19

its argument regarding the proper standard is to be found at pages 15 and 16 of its

opposition to the FTC's motion to unseal, but that section never cites the two

Second Circuit cases, TheStreet.com or Martindell, or otherwise advances the

notion that extraordinary circumstances should be the standard. Rather, Solvay's

opposition brief states that, "[t]he party seeking modification of a protective order

bears the burden of demonstrating good cause for the modification, particularly

where, as here, good cause was shown for entry of the original protective order."

The transcript of the oral argument on this motion similarly reveals no discussion

of the applicable standard. Under these circumstances, we would not fault the

district court for error, even if it had been error, that Solvay invited.[2]

Solvay's unwaived argument is that the district court erred by placing the

burden on Solvay, rather than on the FTC, to show good cause why the document

should remain under seal. As Solvay puts it, "[n]owhere did the district court's oral

or written opinion suggest that the burden was on the FTC to justify modification.

On the contrary, the district court balanced the interest in public disclosure against

---

[2] To excuse its waiver, Solvay argues that we may consider a new argument on appeal if it involves a pure question of law and our refusal to consider it would result in a miscarriage of justice. Ramirez v. Sec'y, U.S. Dep't of Transp., 686 F.3d 1239, 1250 (11th Cir. 2012)). While "[i]t is not clear precisely how severe a potential miscarriage of justice must be to justify consideration of arguments not raised in the district court," we generally find the necessary miscarriage of justice lacking when "the argument raised is weak on its merits." Roofing & Sheet Metal Servs., Inc. v. La Quinta Motor Inns., Inc., 689 F.2d 982, 990 n.11 (11th Cir. 1982). In this case, the argument is unconvincing on the merits. It relies on out-of-Circuit authority that does not support Solvay's position. As TheStreet.com makes clear, the extraordinary-circumstances test does not apply to documents that are judicial records. 273 F.3d at 230-31, 234.

Solvay's confidentiality interests under a presumption of public access, not a presumption that the protective order should be maintained."

The proper standard for district courts to apply in these circumstances is whether there was good cause to unseal the document. A party who has already shown good cause for sealing a document in the first instance should not bear the burden of showing good cause once again if the same opposing party seeks modification of the original protective order. Although Fed. R. Civ. P. 26(c) does not address which party bears the burden in these circumstances, courts regularly impose the burden on the party seeking modification. See Factory Mut. Ins. Co. v. Insteel Indus., Inc., 212 F.R.D. 301, 303 (M.D.N.C. 2002) ("If good cause were not required to be shown when the order was initially entered, the party who later seeks to prevent disclosure . . . bears the burden of showing good cause. If good cause were shown initially, however, the party seeking to modify the order must show good cause." (citation omitted)); Bayer AG & Miles, Inc. v. Barr Labs., Inc., 162 F.R.D. 456, 463-64 (S.D.N.Y. 1995); Jochims v. Isuzu Motors, Ltd., 145 F.R.D. 499, 501 (S.D. Iowa 1992). Plainly, the FTC bore the burden of demonstrating good cause for unsealing the document.

The district court's order does not explicitly state that it placed the burden on the FTC. However, to hold that the district court abused its discretion, we must find that the district court either applied the wrong legal standard or used an

21

improper procedure in deciding the motion. A fair reading of the district court's order indicates that it did place the burden on the FTC and, therefore, did not commit an abuse of discretion.

To the extent that Solvay's complaint is that the district court gave no weight to its prior protective order and treated this motion to modify as if the court was confronting the issue for the first time, we remain unconvinced. The district court's order begins with the general proposition that "[t]here is a presumption that documents relevant to legal decisions are public." Standing alone, this statement is not legally erroneous. The Tulip FA is a judicial record to which the presumption of public access ordinarily would apply. The order then goes on to conduct the good-cause balancing test that we laid out in Chicago Tribune. The district court described the public and FTC interests in the document in findings (b.) and (d.) of its order, Solvay's interests in finding (c.), and concluded that "[t]he public interest in making this record public outweighs the privacy interests of Solvay in its confidential information."

Crucially, the language of the order indicates that the district court did not reweigh the parties' interests from scratch but in fact compared the strength of their interests relative to the time of its earlier order. Thus, for example, the order describes the FTC and its amici's interest in "hav[ing] access to the document and be[ing] able to discuss it openly in their briefing" before the Supreme Court, and

22

then states that "[t]he weight to be given to the public's interest . . . has <u>changed</u> since the Court's earlier orders sealing the document." Similarly, the district court did not weigh Solvay's interests as if Solvay bore the burden; instead, the order stresses that "[t]he sensitivity of the information and the potential for competitive injury to Solvay . . . has been reduced, although not eliminated, with the passage of time." The district court's reasoning -- that "the passage of time has reduced the likelihood of serious injury to Solvay" -- explicitly compares Solvay's current interests to its original good-cause showing.

Moreover, the contents of the briefs on this motion demonstrate that the burden was not placed on Solvay to prove that its interests remained as strong as they were when the original protective order was entered. Rather, the FTC submitted extensive new evidence regarding the changed circumstances that lessened the possibility of harm to Solvay's business interests. In particular, the FTC showed that, since Solvay's acquisition by Abbott, the company had disclosed AndroGel sales information and had introduced a new version of the product, AndroGel 1.62%. The FTC also introduced testimony from the Tulip FA's author, Yang, who stated that she could not reverse-engineer Solvay's profit margins using the Tulip FA alone. In addition, the FTC presented testimony from Solvay's past CEO, who stated that some of the costs of producing AndroGel had changed after the Tulip FA was written.

23

Because the district court did not apply the wrong test or employ an improper procedure, it did not abuse its discretion in this respect.

C.

Solvay also finds fault in the district court's silence regarding Solvay's reliance on the protective order. Solvay claims that Chicago Tribune mandated that district courts consider reliance on a protective order before modifying it. "The district court here gave no indication . . . that it considered the importance of Solvay's reliance on the previously issued protective order," and that "failure alone constitutes an abuse of discretion." We disagree.

Chicago Tribune did not hold that a district court abuses its discretion by not explicitly and specifically addressing reliance in every decision to modify a protective order. The panel's main holding in Chicago Tribune was that "the district court must balance Firestone's interest in keeping the information confidential against the Press's contention that disclosure serves the public's legitimate interest in health and safety." 263 F.3d at 1314-15. In other words, what the panel held that the district court must do is to conduct the good-cause balancing test. The opinion faulted the district court because its order had stated that "concerns of public health and safety trump any right to shield such material from public scrutiny" but had "made no factual findings . . . that support[ed] the conclusion that the public's health and safety [we]re sufficiently impacted by the

24

information contained in these specific documents to trump Firestone's interest in keeping trade secret information confidential." Id. at 1315. Thus, the primary purpose of the remand was to make adequate factual findings regarding the public interest in that case. In a footnote at the end of this section, the panel also instructed the district court to discuss "Firestone's reliance on the terms of the stipulated protective order." Id. at 1315 n.15. This directive made sense in that case, where "[a]t the beginning of the litigation, in what has become commonplace in the federal courts, the parties stipulated to a protective order allowing each other to designate particular documents as confidential and subject to protection under Federal Rule of Civil Procedure 26(c)(7)." Id. at 1307. This passage in Chicago Tribune suggests that discussion of reliance would be appropriate in cases involving reliance on a protective order in force when the document was disclosed.

However, that type of reliance is not at issue here. As the FTC accurately points out, Solvay could not have relied on a protective order to disclose the Tulip FA because Solvay disclosed the Tulip FA before it moved for and received the protective order. In Chicago Tribune, on the other hand, the protective order was entered prior to discovery and was in force during document production. In those circumstances, it made sense to say that Firestone relied on the protective order to disclose confidential information, and that the district court should have taken that reliance into account. Only after Solvay disclosed the Tulip FA, and the

25

government attached the Tulip FA to its complaint, did Solvay move for a protective order sealing the document. In these circumstances it makes less sense to say that Solvay relied on the protective order. After all, Solvay could not have relied ex ante on a protective order to which it had no entitlement, and which it was uncertain of receiving as a matter of the district court's discretion, when it disclosed the Tulip FA.

Perhaps recognizing this, Solvay places great emphasis on the government's assurances of confidentiality. But the government did not promise complete confidentiality. The government only promised that "[i]nformation submitted in response to this letter will be afforded confidential treatment and is exempt from disclosure under the Freedom of Information Act, as provided in 16 C.F.R. §§ 4.10-4.11 and 15 U.S.C. §§ 46(f) and 57b-2(f), respectively." Title 15 U.S.C. § 57b-2(d) provides that the FTC can disclose confidential information "in Commission adjudicative proceedings or in judicial proceedings to which the Commission is a party," and 16 C.F.R. § 4.10(g) states that confidential information may be disclosed so long as, "[p]rior to disclosure . . . , the submitter will be afforded an opportunity to seek an appropriate protective or in camera order." In other words, the FTC's promise of confidentiality was that the information would remain confidential unless and until the FTC filed suit against Solvay, at which point Solvay would be entitled to seek a protective order.

Notably, the FTC's regulations do not guarantee that, if Solvay failed to obtain a protective order, the FTC would withdraw the confidential material. Thus, to the extent that Solvay relied on the FTC's promise, the FTC effectively promised Solvay only the opportunity to apply for a protective order to seal the Tulip FA.

At all events, the briefs presented to the district court thoroughly addressed the question of reliance. The district court did not abuse its considerable discretion by not expressly discussing reliance in its decision.

## D.

Lastly, Solvay claims that the district court "fail[ed] to recognize that the balance of equities weighs strongly in favor of keeping the [Tulip FA] under seal." The district court's conclusion that the equities favored unsealing the document, however, was merely the product of several antecedent factual findings. In order to conclude that the district court abused its discretion, therefore, we would have to overturn those factual findings as clearly erroneous.

The key findings that the district court made were that "[t]he sensitivity of the information and the potential for competitive injury to Solvay if the information is disclosed has been reduced, although not eliminated, with the passage of time," and that, with regard to "the effect of disclosure on competitors' pricing and on rebate negotiations, . . . the passage of time has reduced the likelihood of serious injury to Solvay in either of those areas."

27

For us to conclude that those findings were clearly erroneous, we must be "left with the definite and firm conviction that a mistake has been committed" after reviewing the evidence as a whole. Anderson v. City of Bessemer, 470 U.S. 564, 573 (1985). But "[i]f the district court's account of the evidence is plausible in light of the record viewed in its entirety, [we] may not reverse it even though convinced that had [we] been sitting as the trier of fact, [we] would have weighed the evidence differently." Id. at 573-74. "Where there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous." Id. at 574.

Solvay insists that the competitively sensitive data in the Tulip FA retains the potential to harm the company in its rebate negotiations and with regard to competitors' pricing of their products. However, this is the quintessential case where there are two permissible views of the evidence, and therefore the district court's finding that the likelihood of injury has been ameliorated over time cannot be clearly erroneous. The FTC came forward with substantial evidence that the Tulip FA would no longer be as damaging to Solvay. For instance, in the oral arguments and their briefs before the district court, the FTC pointed at the following pieces of evidence:

1. With regard to reverse-engineering profit, the analyst responsible for the Tulip FA, Elaine Yang, testified that the Tulip FA did not contain the

28

financial assumptions for the financial models, only the results of those models;

2. According to Yang, the cost and revenue numbers, along with modeling assumptions, were contained in a backup spreadsheet that was not included with the Tulip FA;

3. To rely on the numbers in the Tulip FA, one would need to assume that the costs and profit projections had not changed in the intervening seven years;

4. Solvay has introduced a new product, AndroGel 1.62%, which does not necessarily have the same cost structure or profit margin as the original AndroGel product discussed in the Tulip FA;

5. With regard to profit margins, the profit margin of Abbott's (Solvay's parent) pharmaceutical business as a whole is public knowledge and is 76.5 percent;

6. The Tulip FA does not include cost changes that have occurred in subsequent years; the then-U.S. CEO of Solvay testified during an investigational hearing that AndroGel's costs had changed during a three-month period.

On the other side of the ledger, Solvay produced a declaration from James Hynd, the current leader of the AndroGel unit, in which he stated that the profit on

29

AndroGel sales has never been publicly disclosed, and thus that disclosure of the Tulip FA "would cause severe harm to [Solvay] if disclosed to the public."

Neither side has a bulletproof case. The FTC's strongest case is this: the process of reverse-engineering the profits from the Tulip FA requires financial assumptions not apparent on the face of the document itself. Moreover, the document is old and cannot speak to how the company's costs have changed over time. In particular, Solvay has subsequently introduced a new AndroGel product that may have a different cost structure and thus a different profit margin than the former AndroGel product. And, in any case, we know the pharmaceutical unit's overall profit margin. On the other hand, Solvay's strongest case is that the Tulip FA contains a product-specific projection of profit that remains highly confidential information.

But there appear to be holes in both accounts. Some of the FTC's inferences are unpersuasive. For instance, having the entire company's profit margin -- 76.5 percent in this case -- hardly tells us or the public the product-by-product breakdown of profits. As for Solvay's account, the problem is that, even if one could calculate the per-unit profits from 2006, this figure would not necessarily aid competitors or counterparties in present-day negotiations. Public knowledge of AndroGel's 2006 profit margin does not necessarily entail knowledge of AndroGel's 2013 profit margin. Moreover, since costs can change and have

changed in the past, it would be possible or even likely that the document's projections no longer reflect the current profit and loss of the product.

As an example of one fact-bound dispute between the parties, the FTC argued that it had testimony from Solvay's former CEO that AndroGel's costs had changed in the months following the Tulip FA's creation. In its reply, Solvay insists that this testimony reveals that its former CEO meant only that "costs changed directly in proportion to sales," and that "costs chang[ing] in proportion to sales is precisely how margin percentages [i.e., profit] remain constant." But the testimony can be read to support either side's position.

The district court had two conflicting but viable accounts of the evidence, and we cannot now reweigh the evidence and reach our own independent conclusion. The district court chose to endorse the FTC's view by concluding that the Tulip FA's sensitivity has been reduced over time and that the likelihood of injury to Solvay has been lessened. These factual findings were not clearly erroneous. Having found those facts, the district court then did precisely what Chicago Tribune commanded it to do. The district court weighed the public's interest in the document against Solvay's weakened confidentiality interests and concluded that "[t]he public interest in making this record public outweighs the private interests of Solvay in its confidential information."

31

The common-law right of access to federal courts is designed to promote public understanding of significant public events, including what a court does and how a court goes about adjudicating cases. Wilson v. Am. Motors Corp., 759 F.2d 1568, 1570 (11th Cir. 1985) (per curiam) ("[A] common law right of access exists as to civil proceedings. 'What transpires in the courtroom is public property.'" (quoting Craig v. Harney, 331 U.S. 367, 374 (1947)); Newman, 696 F.2d at 801 ("[O]pen proceedings may be imperative if the public is to learn about the crucial legal issues that help shape modern society. Informed public opinion is critical to effective self-governance."). The district court's decision to unseal the Tulip FA enhanced the public's ability to understand the judicial process and a significant legal issue that will shape business practices in the future: whether the FTC is right that so-called reverse payments are anticompetitive and, therefore, violative of Section 1 of the Sherman Act. This issue inherently possesses public significance and has done so since the day this controversy first appeared in court.

The district court had, as we stressed earlier, broad discretion to modify the protective order that it entered three years ago. It found that the passage of time had altered the balance enough so that the value of public access to the Tulip FA exceeded the value of confidentiality to Solvay. We find no abuse of the district court's discretion in this case and affirm its decision to make the Tulip FA publicly accessible.

32

We also vacate the stay entered by a panel of this Court. Order Granting

Stay Pending Appeal, <u>FTC v. Abbvie Prods. LLC</u>, No. 12-16488 (11th Cir. Jan. 10,

2013).

AFFIRMED; STAY VACATED.