TJOFLAT, Circuit Judge, dissenting:
This case concerns one of the most important rights, the right to vote, in two of the most hotly contested 2018 midterm elections. Plaintiffs-alleging that the signature-matching provisions of Florida's Election Code violated the Equal Protection Clause-requested that the District Court enter an injunction requiring all *1332 vote-by-mail ballots rejected for signature mismatch to be counted. Rather than granting or denying the relief the Plaintiffs actually asked for, the District Court took the unprecedented step of repleading Plaintiffs' case and granting relief completely inconsistent with what Plaintiffs requested. Because we should have stayed the District Court's inexplicable and extraordinary grant of relief but did not, I respectfully dissent.
* * *
This case is about vote-by-mail ("VBM") and provisional ballots that were rejected during the 2018 general election due to signature mismatch. Under Florida law, a VBM voter fills out his ballot, puts it in a mailing envelope, signs the voter's certificate on the back of the envelope, and mails it to the county supervisor of elections.[1] For the county canvassing board to count the ballot, the voter's signature on the envelope certificate must match the signature in his voter's registration entry.[2] If the signatures do not match, a VBM voter may submit an affidavit with identification to cure the defect.[3] The voter must deliver his cure affidavit to the county supervisor of elections by the deadline-5 p.m. the day before the election-for his VBM vote to count.[4]
A provisional voter must make a slightly different submission. Because his eligibility to vote cannot be determined when he appears at his precinct to vote, he casts a provisional ballot and signs the voter's certificate.[5] Not later than 5 p.m. on the second day following the election, he may submit to the supervisor of elections evidence supporting his eligibility to vote at the precinct.[6] The canvassing board then examines the evidence, and if it finds the voter eligible, compares the signature on the voter's certificate with the signature on the voter's registration entry.[7] If they match, the provisional ballot is counted.[8]
The Democratic Executive Committee of Florida, on behalf of Democratic candidates and voters throughout the state, and Bill Nelson for U.S. Senate (collectively, "Plaintiffs") brought this lawsuit against Florida Secretary of State Ken Detzner (the "Secretary") on November 8, 2018, two days after the polls for the general election had closed and the county supervisors of elections had announced the results of all early voting and VBM ballots that had been counted.[9] Plaintiffs wanted a federal judgment declaring the signature-matching *1333 provisions of the Election Code[10] unconstitutional and enjoining the Secretary to direct the county supervisors of elections to count all of the votes cast by VBM and provisional ballots that had been, or might be, rejected due to signature mismatch.[11] Democratic Exec. Comm. v. Detzner , 347 F.Supp.3d 1017, 1024 (N.D. Fla. 2018). Plaintiffs alleged that rejecting ballots based on a signature mismatch violated the VBM voters' rights under the Equal Protection Clause of the Fourteenth Amendment, citing Bush v. Gore ,[12] because the signatures are compared without a standard and the decision is therefore arbitrary. Consequently, some VBM and provisional ballots had been erroneously rejected, which denied those voters the right to vote.
After it granted the Republican National Senatorial Committee ("RNSC") leave to intervene and entertained the parties' submissions, the District Court concluded that, as Plaintiffs alleged, the Election Code's standardless signature-matching process had arbitrarily deprived "potentially thousands of VBM [and provisional] voters ... of the right to cast a legal vote," in violation of the Equal Protection Clause. Democratic Exec. Comm. , 347 F.Supp.3d at 1031. But it declined to grant the preliminary injunction Plaintiffs sought-that all of the VBM and provisional ballots be counted.
The Court's unwillingness to grant the relief Plaintiffs were seeking did not end the matter. Acting on its own initiative and without notice to the parties, the Court shifted gears. Ignoring the fact that the Code's standardless signature-matching process had deprived some VBM and provisional voters of the right to vote, the Court (1) acted as if the violation had not occurred, (2) declared that the provision that afforded VBM voters an opportunity to cure "mismatched signature ballots" had been "applied unconstitutionally," id. at 1032, and (3) enjoined the Secretary to direct the county supervisors of elections to
allow [VBM] voters who have been belatedly notified [that] they have submitted a mismatched-signature ballot to cure their ballots by November 17, 2018, at 5 p.m. The supervisors of elections shall allow mismatched-signature ballots to be cured in the same manner and with the same proof a mismatched-signature ballot could have otherwise been cured before November 5, 2018, at 5:00 p.m.
Id.[13]
This is the injunction now before us.[14] The RNSC immediately appealed the order and moved this Court to stay its enforcement. We declined the stay on the theory that the RNSC failed to make the required showing under *1334 Nken v. Holder , 556 U.S. 418, 434, 129 S.Ct. 1749, 1761, 173 L.Ed.2d 550 (2009), including "a strong showing that [it was] likely to succeed on the merits." Order at 2.[15] I dissented because the RNSC made the required showing here, and now I write to explain why.
The RNSC demonstrated that it was likely to succeed on the merits of its appeal. As the District Court's injunctive order clearly implies, Plaintiffs did not have "a substantial likelihood of success on the merits" because the relief they sought-the counting of all VBM and provisional ballots rejected for lack of matching signatures-could not be granted.[16]
To show why the RNSC is likely to prevail here, I trace the District Court's analysis of Plaintiffs' equal protection claim from beginning to end. In one fleeting moment, the Court found that Plaintiffs were likely to succeed on their claim. Then, the Court shifted gears and reframed Plaintiffs' claim. In turn, it granted a preliminary injunction that matched the reframed claim and gave a remedy to a subset of VBM voters-those who, based on the Court's mistaken reading of the Code, had been "belatedly notified" that their ballots were rejected due to signature mismatch. The remedy was a chance to cure the mismatch.
My discussion proceeds as follows. Part I reviews Plaintiffs' complaint and its motion for a preliminary injunction.
Part II recounts the step-by-step process the Court used to conclude that Plaintiffs had a substantial likelihood of success on the merits of their claim and therefore were entitled to the preliminary injunction they requested. The Court reached that conclusion even though Plaintiffs had not met the requisites for a preliminary injunction and thus were not entitled to such relief. The deprivation of the right to vote that VBM and provisional voters had suffered could not be undone, Democratic Exec. Comm. , 347 F.Supp.3d at 1031, even by the District Court.
Part III describes why, even though the District Court found that Plaintiffs had made the required showing for a preliminary injunction, it could not order the Secretary to do what Plaintiffs had requested.
Part IV discusses the injunctive relief the Court gave instead, to the VBM voters who were "belatedly notified." I explain that the District Court granted relief neither party asked for, and I show how the District Court misread the Election Code and violated the Constitution along the way. Part V concludes.
*1335 I.
A.
Plaintiffs' complaint contained two counts, each seeking relief under 42 U.S.C. § 1983 for violations of the Equal Protection Clause. The counts incorporated the same factual allegations: Signature matching is "entirely standardless, inconsistent, and unreliable," because it is "done without any consistent standard or relevant expertise." Moreover, since "[h]andwriting can change ... for a variety of reasons," including "physical[,] ... mechanical ... and psychological factors," "the signature requirement" is "particularly problematic." Deciding whether the signature on the voter's ballot matches the signature on the voter's registration entry is therefore "arbitrary," as if the decision were made by tossing a coin.
Count I, styled "First Amendment and Equal Protection," asserted that rejecting VBM and provisional ballots based on a signature mismatch arbitrarily disenfranchises registered voters, and therefore
is plainly violative of the Equal Protection Clause. "Having once granted the right to vote on equal terms, the State may not, by later arbitrary and disparate treatment, value one person's vote over that of another." Bush v. Gore, 531 U.S. 98, 104-05, 121 S.Ct. 525, 148 L.Ed.2d 388 (2000).[17 ]
To remedy the violations, Plaintiffs asked the Court to enjoin the rejection of VBM and provisional ballots and to order the ballots to be counted (along with the VBM and provisional ballots that were being counted based on matching signatures).
Count II, styled "Equal Protection" and relying on the same Bush v. Gore language, asserted that the signature-matching process disproportionately impacts "racial or ethnic minorities and/or young and first-time voters." Count II contained no factual allegations indicating why this is so and did not allege any intentional discrimination by relevant state actors, a required element of an equal protection claim. Washington v. Davis , 426 U.S. 229, 239, 96 S.Ct. 2040, 2047, 48 L.Ed.2d 597 (1976). This may explain why the District Court never mentioned Count II in its order granting a preliminary injunction. Accordingly, like the District Court, I will focus only on Count I.
To sum up Count I, Plaintiffs alleged that signature matching is arbitrary. That is, according to Plaintiffs, ballots were rejected based on a bogus signature comparison. Plaintiffs sued to vindicate the rights of voters whose ballots were rejected, and they asked for an injunction requiring the counting of all VBM and provisional ballots rejected due to signature mismatch.
B.
Plaintiffs accompanied their Complaint with a motion for a preliminary injunction. The motion asked the District Court to enjoin the Secretary to direct the county supervisors of elections to refrain from
rejecting vote by mail and provisional ballots on the basis of a signature mismatch [and to] toll the deadline for the county canvassing board to submit "unofficial" results to the Department of State ..., in order to ensure that all signed absentee and provisional ballots *1336 are counted and included in all submitted results.
In their responses to Plaintiffs' motion, the Secretary and the RNSC presented arguments based on laches and the four-factor standard for obtaining a preliminary injunction.[18] They argued Plaintiffs' claim was barred by laches, since Plaintiffs had known about the signature-matching requirement for years and did not sue until after the polls were closed and the votes were being counted.
On the merits, the Secretary and the RNSC argued that signature-matching was reasonable under the Anderson - Burdick balancing test,[19] pointing to its role in preventing fraud and the fact that many other states require a signature match for a VBM ballot to count.[20] They additionally argued that any varying standards for signature comparisons across counties fell within the general prerogative of local governments to set their own election procedures. On the other elements of the preliminary injunction standard, the Secretary and the RNSC argued that Plaintiffs' delay in bringing the suit, as well as the availability of adequate state remedies, suggested that no federal equitable remedy was needed. They also argued that the balance of the equities favored them, as judicial decrees changing the rules in the middle of an election are contrary to the public interest.
In sum, what the District Court had before it was a claim that signature matching was arbitrary, every qualified voter had a constitutional right not to be disenfranchised because of it, and the appropriate remedy was to count every signature-mismatched ballot with no additional information or input from the voter. The Court did find that signature matching is arbitrary and that it violates the Equal Protection Clause. But as I explain below, the Court then assumed that signature matching is constitutional, so long as denied voters have a chance to cure. It then granted relief that was designed to give denied voters a longer period to cure. Plaintiffs, who attacked the practice of signature matching altogether, never asked for this longer-to-cure relief.
II.
The District Court recognized that it could grant the preliminary injunction Plaintiffs requested
*1337 only if [Plaintiffs] (1) ... ha[d] a substantial likelihood of success on the merits; (2) irreparable injury will be suffered unless the injunction issues; (3) the threatened injury to [VBM and provisional voters] outweighs whatever damage the proposed injunction may cause the opposing party; and (4) if issued, the injunction would not be adverse to the public interest.
Democratic Exec. Comm. , 347 F.Supp.3d at 1028 (quoting Siegel v. LePore , 234 F.3d 1163, 1176 (11th Cir. 2000) (en banc) ). The District Court found that Plaintiffs satisfied these four factors. I address each in turn.
A.
The Court found that Plaintiffs had satisfied the first factor in answering the question it thought Plaintiffs' equal protection claim presented: "whether Florida's law that allows county election officials to reject vote-by-mail and provisional ballots for mismatched signatures-with no standards, an illusory process to cure, and no process to challenge the rejection-passes constitutional muster." Id. at 1022. The Court answered the question perfunctorily. "The answer is simple. It does not." Id.
In identifying the question presented, the District Court reframed Plaintiffs' equal protection claim as follows: Florida's signature-matching scheme is unconstitutional on its face because it is standardless, which causes ballots to be accepted and denied in an arbitrary fashion, without a meaningful opportunity to cure or challenge the rejection. Since these voters were afforded neither opportunity, Florida's signature-matching scheme failed to pass constitutional muster. Reframed, Plaintiffs' claim was that if VBM and provisional voters were given a meaningful opportunity to cure or challenge a ballot rejection, the fact that the signature-matching scheme had arbitrarily burdened their ballots did not matter.
The District Court answered the reframed question that Plaintiffs' equal protection claim presented in four steps. First, the Court explained why the Code's signature-matching provisions were standardless and produced arbitrary decisions in violation of the Equal Protection Clause. Second, it explained why the procedure the Code provided for curing a rejected ballot was illusory. Third, it found that the Code failed to provide an effective process for challenging such rejection. And last, the Court implied that it could redress with an injunctive order the injury the signature-matching provisions caused VBM and provisional voters.
1.
The District Court found that the Code's signature-matching provisions, Fla. Stat. §§ 101.68(1), (2)(c)(1) (VBM ballots), and §§ 101.048(2)(b), 101.68(c) (provisional ballots), were standardless and therefore offensive to the Equal Protection Clause.
For a vote-by-mail ballot to be counted, the envelope of that ballot must include the voter's signature. [ Fla. Stat. § 101.65.] Once the vote-by-mail ballots are received, county canvassing boards review those ballots to verify the signature requirement has been met. Id. § 101.68(c). In addition to confirming the envelope is signed, the county canvassing boards confirm the signature on the envelope matches the signature on file for a voter. These county canvassing boards are staffed by laypersons that are not required to undergo formal handwriting-analysis education or training . Moreover, Florida has no formalized statewide procedure for canvassing boards to evaluate whether the signature on a vote-by-mail ballot matches the signature on file with the elections office.
Democratic Exec. Comm. , 347 F.Supp.3d at 1023 (emphases added) (footnote omitted).
*1338 In addition to these shortcomings, "counties have discretion to apply their own standards and procedures .... The only way such a scheme can be reasonable is if there are mechanisms in place to protect against arbitrary and unreasonable decisions by canvassing boards to reject ballots based on signature mismatches." Id. at 1030 (emphasis added).
The same was true for the provisional ballots, which were cast by the voter in person. The ballot could not be counted if the signatures did not match:
Provisional ballots are placed in a secrecy envelope and sealed. The person casting a provisional ballot has until 5 p.m. on the second day following an election to present written evidence supporting his or her eligibility to vote. ... A provisional ballot shall be cast unless the canvassing board finds by a preponderance of the evidence the person was not entitled to vote. After making the initial eligibility determination, the county canvassing board must further compare the signature on the provisional ballot voter's certificate with the signature on the voter's registration. If the signatures match, the vote is counted.
Id. at 1024 (citations omitted). In sum, the District Court found that the Code's standardless signature-matching scheme arbitrarily deprived VBM and provisional voters of the right to vote in the 2018 general election in violation of the Equal Protection Clause. Id. at 1031.
2.
Next, the District Court analyzed the Code's provision for curing a signature-rejected ballot in Fla. Stat. §§ 101.68(4)(a)-(b). It found that the "cure period" it provided "was intended to solve the inherent problems in signature matching" but did not. Democratic Exec. Comm. , 347 F.Supp.3d at 1030. In the Court's mind, "the opportunity to cure ha[d] proven illusory. Vote-by-mail voters, in this election, were not notified of a signature mismatch problem until it was too late to cure." Id. As for the provisional voters, the Code provided "no opportunity to cure under the law. Without this Court's intervention, these potential voters have no remedy. Rather, they are simply out of luck and deprived of the right to vote," in violation of the Equal Protection Clause. Id.[21]
3.
The District Court found nothing in the Code that gave VBM and provisional voters the right to challenge a signature mismatch, whether administratively or in court. "Florida law provides no opportunity for [VBM] voters to challenge the determination of the canvassing board that their signatures do not match, and their votes do not count." Id. at 1023.[22] And "[t]here is *1339 no mechanism for a [provisional] voter to challenge the canvassing board's determination that the voter was or was not eligible to vote." Democratic Exec. Comm. , 347 F.Supp.3d at 1024.[23]
4.
Once it recognized that the Code's standardless signature-matching provisions operated to deprive VBM and provisional voters of the right to vote, the District Court had to decide whether it could redress the deprivation with a preliminary injunction. If it could not, Plaintiffs could not satisfy the first factor for obtaining a preliminary injunction, a substantial likelihood of success on the merits.
Plaintiffs' proposal was an order requiring the Secretary to direct the county supervisors of elections to accept the VBM and provisional ballots that had been, or might be, rejected due to signature mismatch and to toll the deadline for the county canvassing boards' submission of the unofficial election results to the Department of State until all these rejected ballots had been counted. If the Court could not issue such an order, Plaintiffs could not show likelihood of success on the merits; nor could they establish the second, third, and fourth factors, since those factors depend on the issuance of an injunction redressing the constitutional violation the Court found.
The Court declined to issue the proposed injunction. It could not ameliorate the deprivation of the right to vote, because, as the Court concluded, that deprivation "cannot be undone." See id. at 1031. But instead of dismissing Plaintiffs' constitutional claim, the Court moved to the second, third, and fourth factors, to determine whether they had been established. In doing so, it implied that Plaintiffs satisfied the first factor, the likelihood of success on the merits.[24]
B.
The District Court had no difficulty concluding that Plaintiffs had established the second factor, irreparable injury. "Potentially thousands of voters have been deprived of the right to cast a legal vote-and have that vote counted-by an untrained canvassing board member based on an arbitrary determination that their respective signatures did not match." Id. at 1031. This deprivation, according to the *1340 Court, would be irreparable if the injunction Plaintiffs proposed did not issue.[25]
C.
The District Court had no difficulty concluding that Plaintiffs had established the third factor as well. The threatened injury to the VBM and provisional voters outweighed whatever damage the proposed injunction caused the Secretary. As the Court put it, "The burden on the right to vote, in this case, outweighs the state's reasons for the practice. Thus, ... this scheme unconstitutionally burdens the fundamental right of Florida citizens to vote and have their votes counted." Id. at 1031.[26]
D.
The District Court found the fourth factor was satisfied because the injunction Plaintiffs sought was
in the public interest. The right of voters to cast their ballots and have them counted is guaranteed in the Constitution. Once again, Florida's statutory scheme threatens that right by rejecting votes based on signature mismatch without an opportunity to challenge that determination.
Id. at 1032 (citation omitted).
* * *
The District Court spent a lot of time analyzing the four factors. But at bottom, it was all window dressing-pretext to issue an injunction unmoored from Plaintiffs' complained-of injury. This analysis had nothing whatsoever to do with the injunction the Court finally issued-to give VBM voters who were "belatedly notified" that their ballots were rejected a chance to cure the rejection.
III.
Finding that Plaintiffs had satisfied the requirements for obtaining a preliminary injunction, the District Court "granted" their motion for that relief. Id. at 1032. But the word "granted" was empty. The Court did nothing to vindicate the right to vote for the VBM and provisional voters whose ballots had allegedly been arbitrarily rejected. "Approximately 5,000" VBM and provisional voters had been disenfranchised in violation of the Equal Protection Clause by the operation of the Code's standardless signature-matching provisions, but they received no relief. The Court gave them no relief because the disenfranchisement could not be "undone." Id. at 1031.
The right of suffrage is "a fundamental political right," Yick Wo v. Hopkins , 118 U.S. 356, 370, 6 S.Ct. 1064, 1071, 30 L.Ed. 220 (1886), protected by the Equal Protection Clause of the Fourteenth Amendment. Bush , 531 U.S. at 104-05, 121 S.Ct. at 529-30. "[T]he right of suffrage can be denied by a debasement or dilution of the weight of a citizen's vote just as effectively as by wholly prohibiting the free exercise of the franchise." Reynolds v. Sims , 377 U.S. 533, 555, 84 S.Ct. 1362, 1378, 12 L.Ed.2d 506 (1964) ; accord Roe v. Alabama , 43 F.3d 574, 580 (11th Cir. 1995) (per curiam). "One source of [the right's] fundamental nature lies in the equal weight accorded to each vote and the equal dignity owed to each voter." Bush , 531 U.S. at 104, 121 S.Ct. at 529.
If, as Plaintiffs alleged, accepting or rejecting a VBM ballot is arbitrary due to *1341 the lack of a uniform signature-matching standard, then it is nearly certain that the ballots of some unregistered voters were improperly accepted and counted, and the ballots of some registered voters were improperly rejected and not counted.
With these two issues in mind, if Plaintiffs' allegations are true and the signature-matching decision is arbitrary, the Code would violate the Constitution in two ways. First, arbitrarily accepting the ballots of unregistered voters, because the signatures seemed to match, and counting their votes would dilute the votes of registered voters. And since this constitutes "arbitrary and disparate treatment, valu[ing] one person's vote over that of another," this vote dilution would violate the Equal Protection Clause. Id. at 104-05, 121, 121 S.Ct. 525 S. Ct. at. 530. Second, arbitrarily rejecting the ballots of registered voters, because the signatures seemed not to match, would deprive those voters of the right to vote, in violation of the Equal Protection Clause.[27]
But even if Plaintiffs were right-and the signature-matching decisions were no better than flipping a coin-the District Court could not grant Plaintiffs' requested relief for two reasons.
First, Plaintiffs' requested relief would have changed the rules that dictate whether a ballot is valid, and it would have done so in the middle of the vote count. Our precedent prohibits this sort of midstream change. See Roe , 43 F.3d at 581. Such changes are fundamentally unfair, since they inevitably dilute the votes of everyone who complied with the pre-rule-change requirements. These are not the rules under which the campaigns and election were conducted, so imposing them at this stage violates fundamental fairness.
The obvious constitutional remedy-the remedy that would cure any problems flowing from the arbitrary signature-matching decisions-would be to knock out all VBM ballots, except the rejected ballots that had been cured (since those voters had proven their identity with adequate identification). But the obvious remedy was out of the question; it would render the outcomes of the 2018 general election politically, if not constitutionally, unacceptable.[28]
Second, Plaintiffs' requested relief was inconsistent with the nature of their claim, which is a facial challenge. Plaintiffs' claim is a facial challenge because, accepting their theory, the Code cannot be applied in a constitutional way-the arbitrary signature-matching decision will always be a constitutional violation. Indeed, the Code was applied exactly as written in this case, yet Plaintiffs still allege that the signature-matching decision is unconstitutional. Nor is the Code applied constitutionally when the supervisor of elections gets the signature-matching decision right. Under Plaintiffs' theory, the decision itself is still arbitrary because it is made without a standard. Any correct decisions are still random, and the whole ballot pool is tainted by the arbitrary filter.
If, as the District Court concluded, the signature-matching process is arbitrary-and thus unconstitutional-only one remedy would cure the harm: preventing the Secretary from enforcing the entire VBM and provisional voting schemes.[29] See *1342 United States v. Frandsen , 212 F.3d 1231, 1235 (11th Cir. 2000) ("The remedy if the facial challenge is successful is the striking down of the regulation ...." (citing Stromberg v. California , 283 U.S. 359, 369-70, 51 S.Ct. 532, 536, 75 L.Ed. 1117 (1931) ) ).
IV.
Instead of dismissing Plaintiffs' claim because it couldn't grant the relief they sought, the District Court pivoted and held this: "Florida's statutory scheme as it relates to curing mismatched-signature ballots has been applied unconstitutionally."[30] Democratic Exec. Comm. , 347 F.Supp.3d at 1032. The Court remedied the manufactured constitutional error by ordering the Secretary to allow voters who were "belatedly notified they ha[d] submitted a mismatched-signature ballot to cure their ballots by November 17, 2018, at 5:00 p.m." Id. (emphasis added).[31] In addition to granting relief unrelated to Plaintiffs' claim-and different from the relief Plaintiffs actually asked for-the District Court also misread the Election Code.
I divide this Part into three sections. First, I explain how the Code operates. Second, I show how the District Court misread and misapplied the Code. Third, I highlight how the District Court abused its discretion and violated the Constitution in the process.
A.
To show what the District Court misunderstood, let's start with the proper understanding of how these VBM provisions operate. A VBM ballot, once filled out, is placed within a mailing envelope. The voter then signs the voter's certificate on the back of the envelope and sends the envelope to the county supervisor of elections, who must receive it by 7 p.m. on election day. Fla. Stat. §§ 101.65, 101.67(2). Instructions, provided with every ballot, warn the voter that if his signature on the voter's certificate does not match the signature on the voter's registration entry, the ballot "will be considered illegal and not be counted." Id. § 101.65.
Immediately after the county supervisor of elections receives the ballot, the supervisor must compare the signature on the voter's certificate with the signature on the voter's registration entry.[32] On finding that *1343 a voter's certificate is missing a signature, or that the signature on the certificate does not match the one in the registration entry, the supervisor of elections must immediately notify the voter, id. § 101.68(4)(a), and allow him to cure the defect.[33] The voter will have until 5 p.m. the day before the election to present the supervisor of elections a signed affidavit that includes a copy of an appropriate form of identification and a sworn statement verifying that the ballot is his. Id. §§ 101.68(4)(a)-(b). This submission can be made via mail, fax, or email. Id. §§ 101.68(4)(c)(4)-(5).
The ballot, and any cure affidavit received, are eventually canvassed. The canvassing board[34] "must, if the supervisor has not already done so, compare the signature" on the voter's certificate or cure affidavit with the one in the registration books "to determine the legality of that vote-by-mail ballot."[35] Id. § 101.68(2)(c)(1). Canvassing need not occur immediately on receiving a ballot or cure affidavit: it can begin any time from 15 days before the election to noon of the day after. Id. § 101.68(2)(a). If a ballot is rejected for a signature mismatch and is not cured under the procedure specified in § 101.68(4)(b), it is marked "rejected as illegal" and is not tabulated, although the ballot itself is preserved. Id. §§ 101.68(2)(c)(1), (5).
B.
The District Court reached its decision that the Code provisions relating to "curing" signature-rejected ballots were applied unconstitutionally because it failed to comprehend how the statutes operated to notify VBM voters that their ballots had been rejected, id. §§ 101.62(1)(a)-(b), and to inform voters of their right to cure the rejection, id. § 101.68(4)(b).
With all of that clearly laid out in the Code, here is how the District Court described the statutory process:
The opportunity to cure is the last chance a vote-by-mail voter has to save their vote from being rejected and not counted. Florida law provides no opportunity for voters to challenge the determination of the canvassing board that their signatures do not match, and their votes do not count. ... Even more striking is the fact that under Florida law, canvassing boards may begin canvassing of vote-by-mail ballots at 7 a.m. on the 15th day before the election, but no later than noon on the day following the election. Fla. Stat. § 101.68(2)(a). Thus, a vote-by-mail voter could mail their ballot *1344 in weeks early, but the canvassing board could also wait, canvass the ballot the day after the election, determine there is a mismatched signature, and toss the vote. The voter therefore gets no chance to cure, since curing must be done by 5 p.m. the day before the election.
Democratic Exec. Comm. , 347 F.Supp.3d at 1023-24.
The District Court reached the conclusion that the signature-matching exercise was carried out by the canvassing boards entirely on its own.[36] Nothing in the allegations of Plaintiffs' Complaint or the briefing on Plaintiffs' motion for a preliminary injunction warranted this conclusion. Nothing in the Complaint or the parties' submissions indicated that VBM voters were "belatedly notified" that the signature on their ballots did not match the signature in their registration entry. The county supervisors of elections are presumed to have processed VBM ballots and voters' cure affidavits in keeping with both the letter and the spirit of the law.[37] Nothing in the complaint or the parties' submissions rebutted that presumption.
A VBM voter waiting until the eleventh hour to submit his ballot ran the risk that his ballot might be rejected. VBM voters were on notice that a chain of events had to happen before they successfully cured a rejected ballot: (1) they had to receive a rejection notice in the mail, (2) they had to prepare a cure affidavit, and (3) they had to present the affidavit to the supervisor of elections by 5 p.m. the day before the election. Obviously, these things would take some time, so a VBM voter knew that it was risky to submit a VBM ballot near the deadline. A VBM voter thus had no one to blame but himself if the time ran out for curing a rejected ballot. See Rosario v. Rockefeller , 410 U.S. 752, 757-58, 93 S.Ct. 1245, 1249-50, 36 L.Ed.2d 1 (1973) (noting that petitioners could have met the 30-day deadline for enrolling in political party, "but chose not to. Hence, if their plight can be characterized as disenfranchisement at all, it was not caused by [the deadline], but by their own failure to take timely steps to effect their enrollment").
* * *
In one breath, the District Court held that the signature-matching provision is arbitrary and thus violated the Equal Protection Clause. See Democratic Exec. Comm. , 347 F.Supp.3d at 1031. But in the next breath, the Court found that the signature-matching provision did not in fact violate the Equal Protection Clause. Indeed, implicit in its granting relief to the "belatedly notified" VBM voters is the conclusion that implementing the signature-matching provisions does not violate the Equal Protection Clause. Thus, it is constitutionally permissible for the supervisors of elections or the canvassing boards to reject a VBM ballot on a finding that the signatures on the ballot or cure affidavit and the voter's registration entry did not match.[38] What was constitutionally impermissible was to belatedly notify a VBM voter of the rejection.
*1345 C.
The District Court abused its discretion in ordering that the county supervisors of elections allow belatedly notified voters time to cure their ballots. "A district court abuses its discretion if it ... applies the law in an unreasonable or incorrect manner ...." Glock v. Glock, Inc. , 797 F.3d 1002, 1006 (11th Cir. 2015) (quoting FTC v. AbbVie Prods. LLC , 713 F.3d 54, 61 (11th Cir. 2013) ). The abuse occurred here because the District Court based its injunctive order on an incorrect reading of the Election Code, thus applying an incorrect legal standard.[39] And this Court, in wrongly assuming that the District Court had a solid legal foundation for its injunctive order, was wrong to deny the RNSC's motion to stay the order.
The District Court not only relied on a mistaken reading of the Code, it also committed several constitutional violations in reaching its ultimate decision.
First, in issuing the injunctive order against the Secretary sua sponte without giving them notice and an opportunity to be heard on whether the order should issue, the Court denied them due process of law.
Second, in issuing its injunctive order after the polls had closed, the Court changed the rules under which the general election had been conducted, effectively rewriting the VBM provisions of the Code. This operated to virtually disenfranchise some VBM voters-those who would have cured but for the deadline and were now unable to submit a cure by the new deadline-and, at the same time, to dilute votes cast at the polls, in violation of the Due Process and Equal Protection Clauses.
Third, in failing to define "belatedly notified," the Court created its own standardless determination for identifying those eligible to vote, in violation of the Equal Protection Clause.
Fourth, in rewriting the VBM provisions of the Code to eliminate its purportedly unconstitutional application, the Court dishonored Florida's separation of powers doctrine, which prevents courts from rewriting statutes, and thereby violated the doctrine of federalism, which precludes federal courts from taking action that would breach a state's separation of powers.
I expand on these constitutional errors in turn.
1.
A reader of the District Court's injunctive order would assume that Plaintiffs had claimed that in belatedly notifying VBM voters that their ballots had been rejected, the supervisors of elections had infringed a right the voters enjoyed under the Fourteenth Amendment, a right they declined to identify. The assumption would be false because Plaintiffs made no such claim. The Court invented the claim by reframing what Plaintiffs actually alleged, and it did so without informing the parties of what was lying in store. Plaintiffs were only attacking the Code's signature-matching scheme; they had no quarrel with the Code's provisions for notifying VBM voters that their ballots had been rejected and explaining how a rejection could be cured.
Saddling a defendant with a judgment on a claim the plaintiff did not assert, a claim based on a legal theory the plaintiff would have rejected,[40] and doing so without *1346 notice to the defendant and affording it an opportunity to be heard violates the Due Process Clause of the Fourteenth Amendment. That's what happened here. The Court entered its injunctive order in derogation of the Secretary's and the RNSC's right to due process.
2.
The District Court changed the rules of the election after the polls had closed, an impermissible remedy under our decision in Roe v. Alabama, 43 F.3d at 581.[41] Changing the rules of an election after the voting is over and the ballots are being counted is an impermissible remedy because it violates rights guaranteed by the Fourteenth Amendment in three ways. First, the new rules enfranchise those who failed to comply with the rules in existence before the voting began and therefore could not legally vote. Second, counting the votes of the newly enfranchised dilutes the votes submitted in compliance with the existing rules. Third, changing the rules virtually disenfranchises some who did not vote. Time constraints, for example, may have rendered these non-voters unable to comply with the existing rules, but they would have voted or cured had they known of the new rules.
The first consequence of the District Court's order, counting votes that would not have been cast prior to the rule changes, would amount to "stuff[ing] the ballot box," id. , and would jeopardize the integrity of the election. The second consequence, diluting compliant votes under the old rules, would disregard the Court's "obligation to avoid arbitrary and disparate treatment of the members of [the] electorate" and would violate the Equal Protection Clause. Bush , 531 U.S. at 105, 121 S.Ct. at 530. The third consequence, virtually disenfranchising those who would have voted (or cured) but for the inconvenience imposed by the preexisting rules, would deprive those would-be voters of the equal protection of the laws. Roe , 43 F.3d at 581.
3.
Now, onto the problems with belated notice. The District Court's injunctive order fails to define "belatedly notified." What constitutes belated notice, and how were the supervisors of elections supposed to determine who was belatedly notified?
Start with the substantive standard of belated notice. This must mean "later than would in fact allow the voter to cure," rather than "later than the supervisor of elections was allowed to wait by statute": the voter must have received notice at an hour actually too late to cure, or with an unreasonably low amount of turn-around time available, if the order is to include him. Interpreting the order otherwise, to rule that only persons who were notified later than required by the statute received belated notice, would not remedy any constitutional problem with the statute. So the most natural reading of the order is that belated notice is a fact-intensive inquiry turning on the voter's individual circumstances. When was the voter notified? What was he told about the cure procedure-was he sent a cure affidavit, directed *1347 to its location on the county elections website, simply informed that it was required, or none of the above? What sort of means and capacity-a computer or fax machine, a few minutes of free time-did he have available to respond quickly, if necessary? The determination would be easy with respect to some voters-those whose ballots originally came in after the 5 p.m. cure affidavit deadline-but harder for others.
The supervisors of elections were not required to retain any of the information that would help resolve the hard cases of belated notice. Much of it would be inherently outside a supervisor's purview-e.g., when the voter checked his mail-so the supervisor would have no idea which voters were actually belatedly notified. Likely, many of these possibly belatedly notified voters sent in (late) cure affidavits. So, supervisors must, for each late cure affidavit already received, determine whether the affiant was actually belatedly notified, in addition to making this determination for every cure affiant who submitted his affidavit between the issuance of the injunction and its deadline two days later. The injunctive order gave supervisors no guidance or standards to apply when making these determinations.
This relief is impermissible under Bush v. Gore , in which the Supreme Court reversed the Florida Supreme Court's order requiring a hand recount that lacked uniform standards across counties for determining the intent of the voter. 531 U.S. at 111, 121 S.Ct. at 533. The Court explained that "[w]hen a court orders a statewide remedy, there must be at least some assurance that the rudimentary requirements of equal treatment and fundamental fairness are satisfied." Id. at 109, 121 S.Ct. at 532. Here, non-uniform standards for belated notice, and how it is to be determined, are practically inevitable. Some counties may set a cutoff date and time to cure. Other counties may ask each voter whether he or she had enough time. Still others may assume that the submission of every cure after the deadline was due to belated notice rather than dilatory voter behavior and therefore count them all. The Court's failure to dictate a uniform standard for deciding those who were or were not belatedly notified is destined, almost assuredly, to result in voters in identical circumstances being treated differently. Under Bush , it must not.
4.
The District Court's injunction functionally writes a new provision into Florida's Election Code as it relates to curing a ballot rejected for want of matching signatures. It was not needed; the statutory provisions the Court overlooked informed VBM voters of everything they needed to know to cast a ballot and have it counted. If the provisions are inadequate, it is the responsibility of the Florida legislature to refine them.
The Florida Supreme Court would not usurp the legislative prerogative and rewrite a significant part of the Election Code as the District Court has done. The separation of powers doctrine would preclude it from doing so. See, e.g. , Fla. Dep't of Revenue v. Fla. Mun. Power Agency , 789 So.2d 320, 324 (Fla. 2001) ("Under fundamental principles of separation of powers, courts cannot judicially alter the wording of statutes where the Legislature clearly has not done so."); Hawkins v. Ford Motor Co. , 748 So.2d 993, 1000 (Fla. 1999) ("[T]his Court may not rewrite statutes contrary to their plain language.").
Under our Constitution, federal courts must respect the doctrine of federalism; it requires the federal courts to respect Florida's decision to fashion a government with three coequal branches, legislative, executive, and judicial. As a sister circuit has *1348 said, "Even the narrowest notion of federalism requires us to recognize a state's interest in preserving the separation of powers within its own government as a compelling interest." Republican Party of Minn. v. White , 416 F.3d 738, 773 (8th Cir. 2005). The court explained that a "state's choice of how to organize its government is 'a decision of the most fundamental sort for a sovereign entity.' " Id. (quoting Gregory v. Ashcroft , 501 U.S. 452, 460, 111 S.Ct. 2395, 2400, 115 L.Ed.2d 410 (1991) ).
If the District Court believed the Code's provisions relating to curing VBM ballots for lack of a signature match violated the Constitution as applied, what could it do? The power the Supremacy Clause, see U.S. Const. art. VI, cl. 2, allows federal courts to review state statutes, but federal courts are limited to refusing to apply the provisions they find unconstitutional. See Frandsen , 212 F.3d at 1235 ("The remedy if the facial challenge is successful is the striking down of the regulation ...." (citing Stromberg , 283 U.S. at 369-70, 51 S.Ct. at 536 ) ); see also Henry M. Hart, Jr. & Albert M. Sacks, The Legal Process 154 (1994) ("American courts have no general power of control over legislatures. Their power, tout simple , is to treat as null an otherwise relevant statute which they believe to be beyond the powers of the legislature ...."). That power does not extend-as the District Court clearly believed-to prescribing new rules of decision on the state's behalf. See Virginia v. Am. Booksellers Ass'n , 484 U.S. 383, 397, 108 S.Ct. 636, 645, 98 L.Ed.2d 782 (1988) ("[W]e will not rewrite a state law to conform it to constitutional requirements.").[42]
The District Court could impose no remedy other than an injunction prohibiting the State's enforcement of the provisions it found offensive to the U.S. Constitution. The Court couldn't impose that remedy, though, because it might leave out in the cold the VBM voters the Court wanted to protect-those belatedly notified. The Court didn't identify the provisions "relat[ing] to curing mismatched-signature ballots" that were unconstitutionally applied. Those provisions are intertwined with other VBM provisions, so the vindication of the rights of the voters belatedly notified might require the Court to enter an order that would bring down the VBM scheme altogether, a result neither Plaintiffs nor the belatedly notified voters could accept.
At the end of the day, the District Court should have been restrained by federalism: the Court should not have taken it upon itself to monitor the operation of Florida's Election Code, fine-tuning its provisions here and there. See Curry v. Baker , 802 F.2d 1302, 1314 (11th Cir. 1986) ("Although federal courts closely scrutinize state laws whose very design infringes on the rights of voters, federal courts will not intervene to examine the validity of individual ballots or supervise the administrative details of a local election.").
V.
This case highlights the many problems that arise when a federal court oversteps *1349 its Article III authority. Here, the District Court overstepped by reframing Plaintiffs' claim sua sponte and without notice to the parties. It also overstepped by granting relief on the reframed claim, relief that Plaintiffs never requested. And finally, the District Court overstepped by effectively rewriting the Election Code.
EXHIBIT 1
(Our Order denying the motion for stay to be attached to opinion)
IN THE UNITED STATES COURT OF APPEALS FOR THE ELEVENTH CIRCUIT
No. 18-14758
D.C. Docket No. 4:18-cv-00520-MW-MJF
KEN DETZNER, in his official capacity as Florida Secretary of State, Defendant-Appellant, NATIONAL REPUBLICAN SENATORIAL COMMITTEE, Intervenor-Defendant-Appellant, versus DEMOCRATIC EXECUTIVE COMMITTEE OF FLORIDA, BILL NELSON FOR US SENATE, Plaintiffs-Appellees.
Appeal from the United States District Court for the Northern District of Florida
Before TJOFLAT, MARTIN, and ROSENBAUM, Circuit Judges.
BY THE COURT:
Before the Court is Appellant National Republican Senatorial Committee's Emergency Motion for a Stay and Motion to Expedite. Appellant's request for a *1350 stay pending appeal is DENIED because Appellant has not made the requisite showing.See Nken v. Holder, 556 U.S. 418, 434 (2009).
Appellant's alternative request to expedite appeal is DENIED.
One judge dissents; opinions will follow.
As for Appellant's concerns about the administrative difficulties of fulfilling the district court's order, it follows logically from the district court's order that any voter who voted by mail and received actual notice after 5 p.m. on Thursday, November 1, 2018, that his or her vote was rejected due to a signature mismatch is a voter who received belated notice of the defect.[1] Therefore, anyone who voted by mail can cure in the manner provided by the district court's order if he or she signs an affidavit or declaration, to be provided by the Secretary of State of the State of Florida or the county voting authorities, affirming under penalty of perjury that he or she did not receive actual notice of the signature defect until after 5 p.m. on Thursday, November 1, 2018.
As there was no cure mechanism for provisional voters whose votes were rejected for mismatched signatures, any provisional voter whose vote was rejected due to a signature mismatch is eligible to cure his or her vote in the manner *1351 provided by the district court's order, regardless of when he or she discovered the defect.

See Fla. Stat. §§ 101.6103(1) -(3) (2018).

See id. §§ 101.6103(5), 101.68(1).

Id. § 101.68(4)(a). The identification requirement may be met by means of a photo (Tier I) or non-photo (Tier 2) ID. Id. § 101.68(4)(c). If a Tier 2 ID is used, the signature on the cure affidavit must match the signature in the registration entry. Id. §§ 101.68(2)(c)(1)(a)-(b).

Id. § 101.68(4)(a).

Id. § 101.048(1).

Id.

Id. §§ 101.048(2)(a)-(b).

Id. § 101.048(2)(b)(1).
References to "VBM and provisional voters" are, unless indicated otherwise, to VBM and provisional voters whose ballots had been, or might be, rejected because the signature on the "voter's certificate" on the envelope enclosing the ballot did not match the signature on the "registration entry." "Registration entry" refers to the "registration books or the precinct register" that contains the putative voter's signature.

"The canvassing board shall report all early voting and all tabulated vote-by-mail results to the Department of State within 30 minutes after the polls close. Thereafter, the canvassing board shall report ... updated precinct election results to the department at least every 45 minutes until all results are completely reported." Fla. Stat. § 102.141(4)(b).

I refer to the relevant Florida statutes as the "Election Code" or "Code."

Plaintiffs also asked the Court to toll the county canvassing boards' deadline for submitting "unofficial" election results to the Department of State to ensure that all VBM and provisional ballots would be counted and included in all submitted election results.

531 U.S. 98, 121 S.Ct. 525, 148 L.Ed.2d 388 (2000) (per curiam).

Plaintiffs had not challenged the Election Code's cure provisions, nor had they sought any relief specifically for VBM voters who had been "belatedly notified" that their ballots were rejected due to mismatching signatures.

The District Court did not explain why it granted this injunction rather than the one Plaintiffs had requested, except to say that "in balancing the equities for this emergency motion, this [i.e., the injunction before us] is the only constitutional cure that takes into account all the parties' concerns." Id. at 1032. The implication is that the relief Plaintiffs requested would not have been an appropriate "constitutional cure."

In addition, the RNSC needed to show that irreparable injury would occur without a stay, the stay would not cause substantial injury to other parties, and a stay was in the public interest. Nken , 556 U.S. at 434, 129 S.Ct. at 1761.

The questions presented by the RNSC's motion for a stay before this Court and Plaintiffs' motion for a preliminary injunction before the District Court were highly similar. As the Nken Court put it,
[t]here is substantial overlap between [the factors governing the granting of a stay] and the factors governing preliminary injunctions; not because the two are one and the same, but because similar concerns arise whenever a court order may allow or disallow anticipated action before the legality of that action has been conclusively determined.
556 U.S. at 434, 129 S.Ct. at 1761 (citation omitted). Both questions focus on the likelihood of success on the merits-on appeal in one setting, at trial in the other. Here, Plaintiffs are likely to succeed on the merits of their appeal if they can likely show that the District Court abused its discretion by issuing the preliminary injunction. In the District Court, Plaintiffs had to show they were likely to succeed on the merits of their equal protection claim. Of course, they were likely to succeed on the merits only if the District Court could grant them the injunctive relief they sought-the counting of all VBM and provisional ballots that might be rejected due to signature mismatch.

Count I mentions the First Amendment only in its style, never in its allegations. And its final paragraph asserts only an equal protection claim: "Based on the foregoing, Defendant, acting under color of state law, has deprived and will continue to deprive Plaintiffs and the voters they represent of equal protection under the law secured to them by the Fourteenth Amendment to the United States Constitution and protected by 42 U.S.C. § 1983."

The RNSC additionally challenged Plaintiffs' standing to sue on behalf of the voters whose ballots were not counted and raised a res judicata argument based on a prior suit, brought by the Democratic Party in 2016, which had challenged the previous signature-matching process.

The Supreme Court has recognized "that the right to vote in any manner and the right to associate for political purposes through the ballot are [not] absolute." Burdick v. Takushi , 504 U.S. 428, 433, 112 S.Ct. 2059, 2063, 119 L.Ed.2d 245 (1992) (emphasis added) (citing Munro v. Socialist Workers Party , 479 U.S. 189, 193, 107 S.Ct. 533, 536, 93 L.Ed.2d 499 (1986) ). And "[e]lection laws will invariably impose some burden upon individual voters." Id. Thus, courts "considering a challenge to a state election law must" apply a balancing test and
weigh "the character and magnitude of the asserted injury to the rights protected by the First and Fourteenth Amendments that the plaintiff seeks to vindicate" against "the precise interests put forward by the State as justifications for the burden imposed by its rule," taking into consideration "the extent to which those interests make it necessary to burden the plaintiff's rights."
Id. at 434, 112 S. Ct. at 2063 (quoting Anderson v. Celebrezze , 460 U.S. 780, 789, 103 S.Ct. 1564, 1570, 75 L.Ed.2d 547 (1983) ).

Thirty-five states other than Florida have such a signature-matching requirement. Vote at Home, Voting at Home Across the States , https://www.voteathome.org/wp-content/uploads/2018/11/Vote-at-Home_50-State-Report.pdf (last visited Feb. 15, 2018).

As it turned out, the Court did nothing for voters who cast provisional ballots; the preliminary injunction it entered did not apply to them by its terms. But the Court essentially intervened on behalf of VBM voters, though it limited its intervention to a subset of VBM voters, to those who were "belatedly notified [that] they ha[d] submitted a mismatched-signature ballot." Id. at 1033.

This statement is correct in part. Once a signature mismatch determination is made (and, for VBM ballots, the cure period is over), there is no administrative remedy, and normal statutory processes will not revive any ballots so rejected. But judicial review of signature-mismatch determinations for VBM ballots is available in the Florida Circuit Court in any circumstance where the number of challenged votes might change the outcome of the election, albeit on a limited record and with a deferential standard of review. Fla. Stat. §§ 102.168(1), (3), (8). Rejection of valid provisional ballots may also be challenged in the Florida Circuit Court, and the evidentiary and standard-of-review limitations of subsection (8) do not apply. See id. §§ 102.168(3)(c), (8) (providing for a cause of action based on "rejection of a number of legal votes sufficient to change ... the result," with limitations that apply only to VBM-ballot signature-mismatch challenges).

At some point in its analysis of whether the Code's signature-matching provisions violated the Equal Protection Clause, the District Court apparently concluded that it did not matter whether the Code provided VBM and provisional voters with effective procedures for curing or challenging the rejection of their ballots. The Court did so for two reasons.
First, in framing their equal protection claim, Plaintiffs did not challenge the constitutionality of the Code's procedures for curing or challenging the rejection of VBM and provisional ballots. From their point of view, the cure provisions were adequate. Rather, the injury for which Plaintiffs sought injunctive relief was the arbitrary rejection of VBM and provisional ballots, and thus the deprivation of the voters' right to vote, in the application of the standardless signature-matching provisions. "[T]he asserted injury," as the Court was quick to recognize, was "the deprivation of the right to vote based on a standardless determination made by laypeople that the signature on a voters' vote-by-mail or provisional ballot does not match the signature on file with the supervisor of elections." Id. at 1030. This was the injury Plaintiffs wanted the Court to redress.
Second, since the signature-matching provisions were unconstitutional, the VBM and provisional voters didn't need a procedure for curing or challenging the rejection of their ballots. An injunction requiring that their ballots be counted would provide them with all the relief they needed.

As I explain in Part III, the District Court was correct not to grant this relief.

Of course, the District Court knew it wasn't going to grant the injunction Plaintiffs asked for. Instead, the District Court was going to grant the injunction that would remedy its reframed claim. This discussion of the second factor was just window dressing.

The scheme may burden the citizens' right to vote, but the District Court-by refusing to grant the injunction Plaintiffs asked for-did nothing to lift the burden and instead maintained the status quo. This discussion was more window dressing.

Similarly, some provisional voters found eligible to vote in the precinct where they voted were arbitrarily deprived of the right to vote because the signatures seemed not to match. See Fla. Stat. § 101.048(2)(b)(1).

Because the District Court could not remedy Plaintiffs alleged injury, it should have found that Plaintiffs were unable to succeed on the merits on their claim.

The Court was right not to grant this remedy, but it should have concluded that, because the only remedy for Plaintiffs' alleged injury was unworkable, Plaintiffs were unlikely to succeed on the merits on their claim. The Court then should have stopped there.

The relevant provisions are Fla. Stat. §§ 101.68(1), 2(a), 2(c)(1), and (4). As the ensuing discussion in the text indicates, the District Court overlooked § 101.68(1) and its relationship to § 101.68(4)(a) and focused instead on §§ 101.68(2)(a) and (2)(c)(1). The injunctive order did not expressly identify the provisions the supervisors of elections unconstitutionally applied. The order is silent as to the constitutional right(s) the supervisors of elections or the canvassing boards violated in applying "Florida's statutory scheme as it relates to curing mismatched-signature ballots."

Despite the District Court's statements about the injury to provisional-ballot voters, its order does not apply to provisional ballots at all: only "voters who have been belatedly notified" can avail themselves of the relief. Id. at 1033. Provisional ballot voters whose ballots were rejected were not "belatedly notified" since there was no requirement to notify them at all. Even if they had been notified that their ballots were rejected, such notice would not be "belated" since there was no opportunity to cure provisional ballots regardless.

The statute reads, in relevant part:
The supervisor of the county where the absent elector resides shall receive the voted ballot, at which time the supervisor shall compare the signature of the elector on the voter's certificate with the signature of the elector in the registration books or the precinct register ....
Id. § 101.68(1) (emphasis added). The use of "shall compare" and "at which time" indicate that this duty is mandatory and must be performed when the ballot is received.

The majority mistakenly concludes that election officials may sit on a VBM ballot and do nothing with it until it's canvassed by the canvassing board. To draw this conclusion, the majority assumes that the canvassing board compares the signatures all on its own. See Maj. Op. at 1320-21 ("And even more problematically, the law did not require canvassing boards to even begin the canvassing of vote-by-mail ballots and check for signature match before noon on the day after the election[, even though signature cures must be submitted by 5 p.m. the day before the election]."); id. at 1324 (noting that submitting a VBM ballot well before the deadline "still would not guarantee that [a voter] would be notified of any signature mismatch until it was too late to do anything to remedy the problem"). Doing so, the majority overlooks the parts of the Code that require the supervisor (1) to immediately compare the signatures after receiving a ballot and (2) to immediately notify a voter that his ballot has been rejected based on a problem with the signatures.

By statute, each county canvassing board consists of the supervisor of elections, a county court judge, and the chair of the board of county commissioners. Id. § 102.141(1).

Presumably, this would happen only if the canvassing board received a VBM ballot after canvassing had already begun. Otherwise, the supervisor would have compared the signatures immediately after receiving the ballot, as he or she is required to do. Id. § 101.68(1).

The majority adopts and endorses this erroneous reading. See Maj. Op. at 1320-21, 1324.

"Ordinarily, we presume that public officials have properly discharged their official duties." Banks v. Dretke , 540 U.S. 668, 696, 124 S.Ct. 1256, 1275, 157 L.Ed.2d 1166 (2004) (quoting Bracy v. Gramley , 520 U.S. 899, 909, 117 S.Ct. 1793, 1799, 138 L.Ed.2d 97 (1997) ).

In fact, the Court endorsed the further use of signature-matching directly within its order: if any voter seeking to avail himself of the remedy submits a cure affidavit with Tier 2 identification, he is just as subject to the chance of rejection for signature mismatch as a voter in the first instance. If one coin flip is unconstitutional, surely adding another doesn't solve the problem.

As I explained in footnote 16, supra , when analyzing the motion to stay, we must evaluate the likelihood that Defendants will succeed on the merits of their appeal. In this appeal, the issue will be whether the District Court abused its discretion by granting the preliminary injunction. Thus, the abuse of discretion is relevant when deciding whether Defendants are likely to prevail on the merits of their appeal.

To accept the Court's position that the signature-matching provisions were valid, Plaintiffs would have to abandon their position that the provisions violated the Equal Protection Clause.

Roe involved an Alabama state law that appeared to require absentee ballots to be either notarized or signed by two witnesses. It was the past practice in Alabama not to count ballots that did not meet this requirement. Id. After a closely contested election, a state circuit court ordered the Secretary of State to count non-notarized and insufficiently witnessed ballots. The District Court issued a conflicting injunction, requiring the Secretary not to comply with the state court order, and we affirmed the order in relevant part. Id. at 583.

Remarkably, courts cannot rewrite statutes even by striking down language, rather than by adding it. Take severability clauses-which the statutes at issue here noticeably lack. In Whole Woman's Health v. Hellerstedt , --- U.S. ----, 136 S.Ct. 2292, 195 L.Ed.2d 665 (2016), as revised (June 27, 2016), for example, the state defendant argued for a "narrowly tailored judicial remedy," not facial invalidation, by pointing to a severability clause in Texas's abortion statute. Id. at 2318-19. But the Supreme Court responded that a "severability clause is not grounds for a court to 'devise a judicial remedy that entails quintessentially legislative work.' " Id. at 2319 (alterations omitted) (quoting Ayotte v. Planned Parenthood of N. New Eng. , 546 U.S. 320, 329, 126 S.Ct. 961, 968, 163 L.Ed.2d 812 (2006) ).